JOHN JACKSON, *ex dem.* MURRAY MCCONNELL, plaintiff in error *v.* DE LA FAYETTE WILCOX, defendant in error.

*Error to Cook.*

The decision of the Register and Receiver of a Land Office, like that of all other tribunals where no appeal is allowed, is final and conclusive, upon all the facts submitted by law, to their examination and decision. Their determination, in relation to the right of pre-emption to a tract of land within their jurisdiction, is conclusive.

There can be neither a reservation, nor an appropriation of the public domain, for any purpose whatever, without express authority of law.

Neither the President, nor any officer of the government, have power to make such appropriation or reservation, without such authority.

The acts of the Secretary of War, and the Commissioner of the General Land Office, in making a reservation of Fort Dearborn, or the land upon which it was situated, were unauthorized by law, and void.

The North Western Territory was ceded by Virginia to the U. S., as a common fund for the use and benefit of all the States, according to their usual respective proportions in the general charge and expenditure, and should be faithfully and *bona fide* disposed of, for that purpose, and for no other use or purpose whatever.

The assent of a State legislature is necessary to the erection, by the U. S., of forts and permanent garrisons within the boundaries of a State.

The term "appropriation," used in the pre-emption laws, means an application of lands to some specific use or purpose, by virtue of law, and not by any other power.

An action of ejectment can be maintained against a military officer, in the occupation of lands, as such.

To constitute actual fraud between two or more persons, to the prejudice of a third, contrivance and design to injure such third person by depriving him of some right, or otherwise impairing it, must be shown. Actual fraud is not to be presumed, but ought to be proved by the party who alleges it; and if the motive and design of an act may be traced to an honest and legitimate source equally as to a corrupt one, the former ought to be preferred.

Fraud may consist in making a false representation with the knowledge at the

McConnell *v.* Wilcox.

time that it is false, with a design to deceive and defraud, or in the wilful concealment of the truth, for a similar purpose.

The pre-emption laws grant to the pre-emptioner an estate in land upon conditions, which becomes absolute upon the performance of those conditions.

The law of the State where the land is situated, is to govern both as to the form of the remedy, and the evidence of title.

In regard to municipal rights and obligations, the government, as a moral being, must be, in contracting, subject, in the absence of a law of Congress in relation thereto, to the laws of the States, and the same principles and rules of interpretation of contracts and acts growing out of them, as prevail between individuals, must be applicable to it.

The character of a general law, and the force, effect, and application thereof, are not to be determined by the character of the parties to the action. If the act of the legislature making a Register's certificate of the purchase of a tract of land of the U. S., evidence of title, is valid as a rule of decision between citizens of the State of Illinois, it is also valid between a citizen and the U. S.

The act of the legislature of the State of Illinois, making the Register's certificate of the purchase of land at the U. S. Land Offices, evidence of title, does not conflict with the Ordinance of 1787.

The act of Congress of 1830, provided "That the right of pre-emption under this act does not extend to any lands which are reserved from sale by an Act of Congress, or by order of the President, or which may have been appropriated for any purpose whatever, or for the use of the United States, or either of the States in which they may be situated." The Proclamation of the President advertising the lands for sale, stated that "The lands reserved by law for the use of schools, and for other purposes, will be excluded from sale." The Commissioner of the General Land Office wrote a letter to the Secretary of War, stating that the whole of Fractional Section 10 was reserved for military purposes. This letter was in reply to a request from the Indian Agent at Chicago, to the Secretary of War, requesting that Section 10 might be reserved for the Indian Department, and by the latter transmitted to the Secretary of War. *Held* that that there was no legal reservation of Section 10. *Held,* also, that under a fair construction of the aforesaid act, and the act authorizing the President to reserve such lands as he may deem necessary for military posts; lands not expressly reserved in the proclamation of the President, were subject to sale, though they had previously been reserved by law.

The admitting of a portion of Section 10, the whole of which the Commissioner of the General Land Office had declared was reserved for military purposes, to be entered by a pre-emptor, is a declaration on the part of the government that there was no legal reservation.

A patent is not the *title* itself, but the evidence thereof.

In a republic, the title to land derived from the government, springs from the law.

The certificate of a Register of a Land Office, of the purchase of a tract of land from the U. S., is of as high authority as a patent.

The words "*better, legal, paramount title,*" used in the act of the legislature, making the certificates of the Land Officers evidence, do not mean the title of the U. S.; but they refer to cases where the U. S. had not the title at the time of the sale and issuing of the certificate.

The United States could not be a defendant in a State court to any action whatever, such court having no jurisdiction over her; and consent could not give it. And although it is certainly true that the tenant, in all actions of ejectment, may defend himself by showing the title of his landlord, it does not follow that the party, who could not be a defendant for want of jurisdiction in the court over him, may defend himself in such case in the name of a person, who, upon no reasonable supposition, could be considered as standing in the relation of a tenant.

THIS cause was tried at the October term, 1836, of the Cook Circuit Court, before the Hon. Thomas Ford. Judgment was rendered for the defendant in that Court.

M. McCONNELL, for the plaintiff in error.

McConnell *v.* Wilcox.

D. J. BAKER, for the defendant in error.

SMITH, Justice, delivered the opinion of the Court:(1)

This was an action of ejectment, commenced in the Circuit Court of Cook county, to recover possession of a part of the S. W. fractional quarter of Section 10, T. 39 N., R. 14 E., on which Fort Dearborn is situated; and was submitted for the decision of the Circuit Court upon an agreed case, in the nature of a special verdict. The Circuit Court, after mature examination of the various points presented in the case, and deliberation thereon, delivered an opinion, in which it decided that the entry and purchase by Beaubien, of the tract of land in question, under the pre-emption act, was valid and legal in every respect; but that, for the reason given in its opinion, which will be examined hereafter, he could not assert his right against the " *United States* in the present *form* of action," and accordingly rendered judgment for the defendant.

To revise this judgment, the present writ of error has been prosecuted.

The principal and direct error relied on by the plaintiff, in this cause, is, this portion of the decision of the Circuit Court; and it might, perhaps, be sufficient to merely review the grounds upon which that part of the decision has been predicated: but as the case is marked with facts which bring into discussion principles of a peculiarly interesting and important character, it has been considered more necessary and proper, to examine the whole case as presented by the record. And here it may not be amiss, in the consideration which is to be bestowed upon it, and to a correct elucidation of the respective rights of the parties to the controversy, to recur very briefly to a review of the history of the public lands in the Western States. The whole territory north of the river Ohio, and west of Pennsylvania, extending northwardly to the northern boundary of the United States, and westwardly to the Mississippi river, was claimed by Virginia; and she insisted that the same was within her chartered limits. During the war of the Revolution, her gallant troops, under the command of George Rogers Clark, conquered the country, and she came into the possession of the French settlements at Vincennes, and those situated on the Mississippi river. The States of Massachusetts, Connecticut, and New York also claimed considerable portions of the same territory. Many of the other States, whose limits contained but a very small portion of waste and uncultivated lands, contended that a portion of the immense body of waste lands lying within the territory claimed by Vir-

(1) This cause was heard at the last December term of this Court. LOCKWOOD, Justice, dissented from the opinion of the majority of the Court: and WILSON, Chief Justice, being interested in the decision of the questions involved in the cause, gave no opinion.

ginia and the other States who had advanced their respective claims to the same, ought to be appropriated, as a common fund, to pay the expenses of the war. Congress, with the desire and hope of composing these conflicting claims and opinions, recommended to the States having these large tracts of unappropriated and waste lands in the now Western States, to make a liberal cession to the United States, of a portion of their respective claims, for the benefit of all the States composing the Union. Virginia, acting on the suggestion, on the 1st of March, 1784, ceded to the United States, all her right, title, and claim to the territory north-west of the river Ohio, on certain conditions, some of which were, "that the rights of the old French settlers should be secured, that 150,000 acres near the rapids of the Ohio for her State troops, who had reduced the country, and another of about 3,500,000 to satisfy bounties promised to her troops, on the continental establishment, should be reserved;" but the most important condition of the cession was, that "all the lands within the territory so ceded, and not reserved or appropriated to the purposes named in the act of cession, should be considered a common fund, for the use and benefit of such of the United States as had, or should become, members of the Confederation, Virginia inclusive, according to their usual respective proportions, in the general charge and expenditures, and should be faithfully and bona fide disposed of for that purpose, and for no other use or purpose whatsoever." In June, 1786, Congress recommended to the legislature of Virginia to take into consideration their act of cession, and revise the same, so far as to empower the United States to make such a division of the territory of the United States, lying northerly and westerly of the river Ohio, into distinct republican States, not more than five nor less than three, as the situation of that country, and future circumstances, might require; which States should hereafter become members of the Federal Union, and have the same rights of sovereignty, freedom, and independence as the original States, in conformity with the resolution of Congress, of the 10th of October; to which revision and alteration so proposed, the State of Virginia, on the 30th of December, 1788, by her legislature, assented; and did ratify and confirm the same, and the 5th Article of the Ordinance of Congress in relation thereto. New York, Massachusetts, and Connecticut made similar cessions, and thus the conflicting claims of these States were adjusted. This succinct narrative of the manner, and the objects for which these several cessions were made, will be obvious, when the power of the United States to make appropriations of the public domain, and the particular manner in which they may be done, and objects to which such appropriations are applied, shall have been considered.

McConnell *v.* Wilcox.

From the facts disclosed in the agreed case, of which we shall recite such parts as we deem material to be examined and considered, it appears that Beaubien, in the year 1817, bought a house on the fraction of land in question, from one Dean, an army contractor, for $1,000; also, an enclosure and garden attached thereto, which were in possession of and occupied by said Dean; that thereupon, Beaubien took possession thereof, and occupied the same, and cultivated a part of the enclosure and garden in every year, from 1817 to the 19th of June, 1836; that in 1823, certain factory houses, built on the said land, were, by the order of the Secretary of the Treasury, sold, and one Whiting became the purchaser. In the same year, Whiting sold the same to the American Fur Company; and the said company sold the same to Beaubien for five hundred dollars, who took possession thereof, and continued to occupy the same, together with a part of the said quarter section of land, to the date of the commencement of this suit. The occupation and use of the buildings and ground, by Beaubien, was undisturbed and undisputed, by any person whomsoever, from the year 1817, to the time of commencing the present action. It further appears, that upon this state of facts, Beaubien having cultivated a part of the S. W. fractional qr. S. 10. T. 39 N., R. 14 E., and being in actual possession of the part cultivated, on the 29th May, 1830, (the date of the first pre-emption law) and that he also cultivated a part in 1833, was in actual possession, on the 19th June, 1834, (the date of the last pre-emption law) and that being thus possessed, on the 7th May, 1831, he made application for a pre-emption to the Land Offices at Palestine, which was rejected, though on the same day, a pre-emption was granted, at the same office, to one Robert A. Kinzie, for the north fractional quarter of the same Section. He also applied, in June, 1834, to the Land Office at Danville, for a pre-emption, which was refused; and he was informed that the tract claimed had been reserved for military purposes; that after the establishment of the Land Office at Chicago, the President of the United States, on the 12th February, 1835, by Proclamation, directed various lands in that District, in which it is admitted the lands in question are, to be exposed to sale on the 15th June, 1835, including the South-West quarter of Section 10, unless the same is excepted in the terms used in said Proclamation, under the words "The lands reserved by law for the use of schools, and for other purposes, will be excluded from sale." Appended to this Proclamation, is a general notice to all persons claiming pre-emptions to any of the lands directed to be sold, requiring them to appear before the Register and Receiver, before the day of sale, and make proof of their pre-emption. The Commissioner of the General Land Office transmitted to the Land Office at Chicago, the extended plat of the lands in

the Proclamation described, marking and coloring thereon certain lands to be reserved from sale; but no part of fractional Section 10, was so marked to be reserved. On the 28th of May, 1835, it further appears, that Beaubien applied at the Land Office at Chicago, and there proved, to the satisfaction of the Register and Receiver, that he was entitled to a pre-emption on said lands, under the Act of the 19th of June, 1834; and on the same day entered and purchased, by means of his pre-emption, the South-West fractional quarter of Section 10 aforesaid, in due form of law, by paying the purchase money, and obtaining the Receiver's receipt, and Register's certificate of entry and purchase. It also appears, in the agreed case, that the lessor of the plaintiff, duly and formally purchased of Beaubien, before the commencement of this suit, so much of fractional Section 10 as is now in controversy, including the stockade and fort, with notice that a controversy existed as to the title of the same.

It further appears that at the commencement of the suit, the defendant, as an officer of the army, with soldiers under his command, occupied the post (consisting of some wooden buildings, and a stockade of pickets agreed to be worth three dollars per month) by orders from the Secretary of War. This post was first occupied by the troops of the United States, in 1804, and such occupation continued until the 16th of August, 1812, when it was taken by the savages, and the troops all massacred. On the 4th of July, 1816, it was re-occupied by the United States troops, and such re-occupation continued until May, 1823, when it was abandoned by the order of the government, an Indian Agent being left in possession. Some factory houses were built on the fraction for the use of the Indian department. On the 10th of August, 1828, it was again occupied by the United States troops, and in May, 1831, evacuated, and left in the possession of a citizen, who authorized another citizen to take possession thereof. In 1832, it was again re-occupied by the troops, and such re-occupation continued up to the commencement of this action. The lands in question were surveyed in 1821. On the 2d of September, 1824, the Indian Agent at Chicago, wrote a letter to the Secretary of War, requesting that the tract in question might be reserved for the use of the Indian Agency at that place; which letter, it appears, was, on the 30th of the same month, transmitted to the Commissioner of the General Land Office, with a request that fractional Section 10 aforesaid might be reserved for the use of the Indian Department. In reply to this letter, the Commissioner, on the first of October following, directed that the whole of fractional Section 10 aforesaid, should be reserved for military purposes. In January, 1834, the Commissioner of the General Land Office addressed a note to the Secretary at War, enquiring whether the said fraction was re-

2D

served for military purposes, or for the use of the Indian Depart-
ment, and was answered that it was wanted, and then used, for
military purposes.

The case also exhibits as evidence, the duplicate receipt of the
Receiver of public moneys of the Land Office at Chicago, ex-
pressing on its face full payment of the purchase money by
Beaubien, for the fractional quarter Section of land in contro-
versy, under the pre-emption act of the 19th of June, 1834; also
a certificate of the Register of the same Land Office, stating the
fact of purchase and sale, under the same pre-emption law, by
the same individual; the original of which, it is admitted, is on
file in the General Land Office; and another certificate, by the
same Register, given to the purchaser, stating the fact, that the
sale and purchase are matters of record in his office; and lastly,
a deed for the premises in question, from the pre-emptor to the
lessor of the plaintiff. Upon this exhibition of title by the lessor
of the plaintiff, and all the facts connected therewith, as disclosed,
and the several acts of Congress applicable thereto, and the laws
of this State, he insists that he is entitled to recover the possession
of the premises sued for; having, as he contends, shown a legal
title to the same, and the right of possession. The defendant
insists, 1st. That no action of ejectment will lie against the com-
mander of a fort; 2d. That the fraction of said land in question,
was reserved, or appropriated by lawful authority, for military
purposes; and that, therefore, the Land Officers had no juris-
diction over it to authorize the granting of a pre-emption to it,
or to sell it; and that their acts are necessarily void, and convey
no title whatever to the pre-emptor: 3d. That the legal estate
in the land is still in the United States, and that a patent is
necessary to be issued before a divestiture of the title of the
government can take place: 4th. That the government, though
no party to the suit, may assert its right to the ground, through
the officer in the possession thereof.

In the investigation proposed to be given to the case before
us, the several points, in the natural order in which they occur,
with the facts and principles they involve, will be discussed, and
such conclusions stated as seem to be justly inferrible therefrom.
Adhering to this order, we propose to examine, first, all the
essential facts connected with the disposition and title to the
land, as set forth on the part of the lessor of the plaintiff;—and
we are necessarity led to the enquiry, What is the character of
the title exhibited? To ascertain this, it will, we apprehend, be
unnecessary to particularly enumerate more of the provisions of
the various acts of Congress, which provided for the sale and
disposal of the public lands, than relate directly to the pre-
emptions authorized by the laws of 1830 and 1834; and such
other acts, as taken in connection therewith, have a bearing on

this case; and from which, to ascertain whether the acts of the Register and Receiver, in this particular case, are within the scope of the powers conferred, and the duties required of them, by law. It cannot, we apprehend, be denied, that if these acts have been confined within the limits of the jurisdiction confided to these officers, such acts must be valid and binding, unless an appeal has been provided for, or a revision of their decision in some other mode is prescribed by law. The Supreme Court of the United States have, in a variety of cases, asserted this doctrine, and particularly in the cases of Brown *et al v.* Jackson, 7 Wheaton; Polk's Lessee *v.* Wendell, 5 Wheaton; 1 Cranch 171; 4 Wheaton 423; 3 Peters 412; 4 Peters 563; 2 Peters 147, 168. That Court has said, in these cases, "That the decisions of the Board of Commissioners, under the acts of Congress providing for indemnification of claimants to public lands, in the Mississippi Territory, are conclusive between the parties, in all cases, within the jurisdiction of the Commissioners:" That as to irregularities committed by the officers of the government prior to the grant, the Court does not express a doubt, but the government, and not the individual, must bear the consequences resulting from them. This Court disavows having ever decided more than that an entry, or other legal incipiency of title, was necessary to the validity of a grant issued by North Carolina, for lands in Tennessee, after the separation. They have never expressed an inclination to let in enquiries into the frauds, irregularities, acts of negligence, or of ignorance, of the officers of government prior to the issuing of the grant; but on the contrary, have expressed the opinion that the government must bear the consequences. 'It is a universal principle, that, where power or jurisdiction is delegated to any public officer, or tribunal, over a subject matter, and its exercise is confined to his, or their discretion, the acts so done, are binding and valid, as to the subject matter; and individual rights will not be disturbed collaterally, for any thing done in the exercise of that discretion, within the authority and power conferred. The only questions which can arise between an individual claiming a right under the acts done, and the public, or any person denying their validity, are power in the officer, and fraud in the party; all other questions are settled by the decision made, or act done, by the tribunal, or officer, whether executive, legislative, judicial, or special, unless an appeal is provided for, or other revision, by some appellate, or supervisory tribunal, is prescribed by law.' Proceeding then to ascertain what those powers and duties are, it will be seen, that by the act of 1830, it is provided that every settler and occupant of the public lands, who cultivated any part thereof in 1829, and was in actual possession, on the 20th day of May, 1830, should be entitled

to enter; at private sale, a quarter section, to include his improvements.

The act further provides, " That the right of pre-emption under this act, does not extend to any lands which is reserved from sale by an act of Congress, or by order of the President, or which may have been appropriated for any purpose whatever, or for the use of the United States, or either of the States in which they may be situated." The act of 1834, provides, " That every settler and occupant of the public land, who cultivated any part thereof in 1833, and was in actual possession on the 19th June, 1834, should have a similar right to enter at private sale, a quarter section, to include his improvements." This act, also, revives the act of 1830, and continues it in force for two years. Now under these acts, what were the duties the Land Officers had to perform ? Were they not to satisfy themselves that the applicant for, the pre-emption had proven himself an occupant and settler within the provisions of these acts; and had cultivated a part of the tract applied for, according to the requirements thereof. If satisfied of these facts, and the land was not reserved, or appropriated within the meaning of the recited provisions of the pre-emption laws, but, on the contrary, had been proclaimed for sale, by the order of the President of the United States, by what right, or the exercise of any other than an arbitrary will, could they have refused to permit the applicant to enter and purchase the tract in question ? The proof shows, that this land, with others in the district, was ordered for sale, and that while other tracts were designated, by coloring them on the maps as excluded from sale, this tract was not so colored ; that no information had been communicated to the officers, from any department of the government, that the land had been reserved or appropriated, or that it in any way fell within the exceptions enumerated in the pre-emption acts, anterior to the entry, sale, and purchase by Beaubien. In the absence of any such information, they were necessarily bound to decide, that they had no power themselves to withhold it from sale ; and had they not granted the pre-emption to Beaubien, by what authority would they have been justified from exposing it to public sale, as they were ordered by the President's Proclamation ? How were they to determine that the government had not chosen to expose it to public sale, in the absence of all instructions to the contrary, and with no evidence whatever that it was legally reserved from sale, or excluded by the provisions of the pre-emption acts ? An analogous case, which seems to be striking, has been put, and for the sake of illustration, it will be stated. By law, all lands containing lead ore, are reported by the surveyor. If, however, a tract not so reported, should contain lead ore, and not be discovered before the sale, after it should have been duly sold, could the

McConnell *v.* Wilcox.

United States annul the sale? It would be difficult to affirm it could, because the officers had jurisdiction to sell, and had no evidence that it contained ore. But the present case is supposed to be much stronger than the one put, as there is an express reservation from sale in the case of lands containing ore, and, as is contended, no reservation by law in the present instance. It might, however, be asked, whether the Register and Receiver were merely to examine into the cultivation and occupancy of the lands, or whether they were required to ascertain whether the land was public land?—whether it was within the district, and had it been reserved from sale, or appropriated by law to any purpose whatever? If it were their duty to investigate the three latter points, then it seems clear, that they only were to be satisfied on all the questions presented, and that their decision, like that of all other tribunals, where no appeal is allowed, is final and conclusive, upon all the facts submitted to their examination and decision. This Court could not review, or reverse their decision, nor could its propriety be enquired into.

The Proclamation of the President had declared that certain lands were reserved from sale; but how were the Land Officers to ascertain which those lands were? So far as the Proclamation had specified them, and as to those which they had been apprized by official information from the proper department of the government, were of that character, there could be no doubt. But as to the ascertainment of others, they must necessarily rest altogether upon extrinsic evidence. And if this supposition be correct, then it necessarily implied a power and jurisdiction, in them, to ascertain and decide all the points stated. It is not deemed important to directly decide the question, as to the authority of the officers to make the three latter enquiries, though the right to investigate and determine all the points, would seem to be admitted by a recent opinion of the constitutional law officer of the general government, in which he affirms, " That the power of ascertaining and deciding on the facts which entitle a party to the right of pre-emption, is exclusively vested in the Register and Receiver of the land district in which the lands are situated, without any power of revision elsewhere; and that in weighing the evidence, and in deciding on its sufficiency, these officers act in a judicial capacity; if it proves to their satisfaction, that the settlement and improvement required by law have been made, they must allow the entry; if it fails to satisfy them of these facts, they must disallow it. The law has not authorized any other officer to reverse, or revise their decision; nor can they be compelled to decide according to the dictates of any judgment but their own." These views are undoubtedly in accordance with the opinions of the Supreme Court of the United States, already referred to, and, we think, imply full power in the officers

2D*

McConnell v. Wilcox.

to investigate and decide all the points presented. Those of settlement and cultivation, are exclusively and undeniably within their jurisdiction. The assumption that the Land Officers were bound to enquire into and ascertain, whether the land was not reserved or appropriated, would clearly imply a right of investigation into all the facts connected therewith, and jurisdiction over the subject matter of their investigation; and if so, according to the foregoing views, would be exclusive and final. Waiving this view of the case, let us suppose that the enquiries of these officers were confined to settlement and cultivation only; and that the right of the pre-emption depends on the fact, whether the fraction was not reserved or appropriated, in the manner, and to any of the objects specified in the pre-emption laws of 1830 and 1834. We take it for granted, that there can be neither a reservation nor appropriation of the public domain, for any purpose whatever, without the express authority of the law. It cannot, surely, be seriously contended, that the President of the United States, or any of the executive officers in the several departments of the government, possess an absolute and inherent power to do any official act not authorized by the Constitution or laws of the United States. To the Constitution and laws they must alone look for the source of their power and authority, because they can derive them from no other. The government itself is a limited one, and the great charter under which it exists, has prescribed bounds which cannot be rightfully transcended; and all its functionaries are necessarily restrained, by its provisions, and the laws made in pursuance thereof, from the exercise of an authority not granted thereby. If it be considered that the President may reserve, or appropriate, the public domain, to any purpose he may in his judgment deem useful to the country, without warrant or authority of law, why may he not, in like manner, appropriate the public treasure for similar objects? The one may be as laudable as the other; but both would be equally unauthorized and illegal. To admit for a moment, that the President, without the authority of law, may direct the application of the public moneys of the nation, to even such objects as may undeniably be salutary and highly useful, would be to admit the exercise of a power in direct violation of the Constitution; and yet, the exercise of a power appropriating and applying the public lands to purposes not authorized by law, but in direct violation of the express condition on' which they were ceded, and the purposes to which they were solemnly stipulated to be applied, it is contended, is an implied power, rightfully exercised, by an inferior officer of the government, without the assent of the executive of the nation. This position is most assuredly untenable: neither the officer, acting in his own name, or that of the President, nor the President himself, possess any

such authority. To appropriate the public land, seems to us to be an appropriation—at least virtually so—of the treasure of the nation, inasmuch as it is property, and out of which the moneys of the nation are raised by sale.

Admitting, however, for the sake of argument, the power of the Commissioner to make the reservation agreeably to the request of the Secretary of War, it will be found not to have been made in conformity to the object required; nor does it appear that any act was ever done, setting it apart from the common mass, for any purpose whatever. No record appears to have been made of it. The letter of the 'Commissioner is only evidence that the act was directed to be done; but whether it was, or in what manner it was performed, or by whom, it does not appear. As late as 1834, the Commissioner of the General Land Office was not aware that it had been reserved, and he accordingly applies to know whether it was wanted; having probably learnt from other sources than from the archives of his office, that a garrison was on it. Indeed, the frequent abandonment of the post, and subsequent temporary occupation of it, afford strong presumptive evidence, that it never was considered a permanent post, much less a reservation, made for the object of a permanent garrison.

But the Commissioner had no such power. On examination of the organization of the General Land Office, it will be perceived that it is constituted, by the act of the 25th of April, 1812, a a subordinate office, in the Treasury Department, and is placed under the immediate direction, supervision, and control of the Secretary of the Treasury: without his authority, or that of an express law, the Commissioner can do no act whatever, much less that of making a reservation of the public domain, or of appropriating it to any object whatever. To make, then, the act of the Commissioner valid, in the present case, admitting that the power existed in the Treasury Department, the Commissioner should have acted in obedience to the direction and authority of the Secretary of the Treasury ; but the Secretary, for aught that appears, was and remained, in total ignorance of the attempt to create the reservation—never directed it—nor subsequently sanctioned the act of the Commissioner. We must therefore come to the conclusion, that the acts of the Commissioner of the General Land Office, and of the Secretary of War, in attempting to reserve and appropriate this fraction, were unauthorized, and not warranted by law. It has been said that the act of these officers may be considered as the act of the President, and therefore valid. The President does, doubtless, exercise many of the powers conferred on him by law, through the agency of officers of the Executive Department; and had there been an act of Congress, authorizing the President to make reservations of the

public lands for military purposes, the argument would have had much force; but none such has been shown: and we understand it is conceded that none such exists. Some obsolete laws, authorizing the President to erect fortifications and trading houses in the Indian country, have been referred to, as authorizing the reservation; but they are considered as having no application whatever to the case before us. In the absence of any law authorizing the application of the lands in question, to the objects to which they have been applied, it will be remarked, that they were requested to be set apart for the use of the Indian Department; but the Commissioner declares he had directed them to be reserved for military purposes; a singular discrepancy between the object for which they were applied, and the use to which they are said to have been reserved; and one by no means reconcileable with the intent and objects for which the reservation was sought. Independent of the absence of power in the President, or the heads of the Department, to make the reservation contended for, it appears to us that it was not competent for either thus to apply the public domain, because it was not one of the objects for which we have seen Virginia had made the cession. It was agreed by all the parties to the cession, that the land so ceded, " should be considered a common fund, for the use and benefit of such of the United States as had or should become members of the Confederation—Virginia inclusive—according to their usual respective proportions in the general charge and expenditure, and should be faithfully and bona fide disposed of, for that purpose, and for no other use or purpose whatever." Now can it be contended, that, in direct violation of the terms of this compact between the United States and Virginia, and instead of faithfully applying the land in question to the objects stated, by a bona fide disposition thereof, the President, of his mere arbitrary will, could appropriate the same, without law, to a use and purpose expressly prohibited. If it were competent for any power whatever thus to apply the land, most certainly Congress could alone give the authority thus to use it; though it might still be questioned, whether such an act could be in conformity to the use and trust upon which Virginia ceded the territory. What would be the legal effect of a violation of the terms of the compact under the deed of cession? Would it not be a reversion of the lands ceded to the original donor? Be the effect what it may, the United States, as the trustee of the States, had no power to divert the funds from the objects of· their application, nor to· misapply their use in any manner whatever. It may be said, that Congress has, in repeated instances, applied the public lands to objects confessedly without the terms of the grant. Admitting that she has, and that the States, by their representatives, are supposed assenting thereto, and that therefore the objection is

removed, does it follow, that because this assent is thus presumed —though in truth, in many instances, it is never given, because on many occasions the whole delegation of a State in Congress, have disapproved and voted against these appropriations—that the President, or a subordinate officer of the government, may, when it is apparent no such assent can be given, do an act which, if it can be done at all, Congress alone possesses the power to do.

The Supreme Court of the United States, in the case of Jackson *v.* Clark,(1) in discussing the principles involved in that case, having quoted the terms of the deed of cession from Virginia, remark, " That the government of the United States then received this territory, in trust, not only for the Virginia troops on the continental establishment, but also for the use and benefit of the members of the Confederation, and this trust is to be executed by a faithful and *bona fide* disposition of the lands for that purpose." Language cannot be stronger, nor more directly applicable to the case before us, and it shows, most conclusively, that the highest tribunal in the nation sanctions the rule here asserted. In reflecting on this branch of the case, another, and not inconsiderable objection has arisen, in our opinion, to the exercise of the power contended for, which seems to conflict with the spirit, if not the letter, of the 16th paragraph of the eighth section of the first Article of the Constitution of the United States, which provides that " Congress shall have power to exercise exclusive legislation, in all cases whatsoever, over such district, (not exceeding ten miles square,) as may by cession of particular States, and the acceptance of Congress, become the seat of government of the United States; and to exercise like authority over all places purchased by consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and all other needful buildings." From the paragraph quoted, it seems apparent that the members of the Convention who formed the Constitution, contemplated that places for forts, magazines, arsenals, dock-yards, and other buildings connected therewith, would be required to be purchased from individuals, in the several States, where their selection and erection might be deemed necessary; and that it was still more important to give exclusive legislation over the places ceded, for public convenience and safety; but still the consent of the State legislature was required, before such purchases could be made of individuals, and the places be so used. May it not, also, have been intended that forts, and permanent garrisons, should not be thus erected without the consent of the State; and that to prevent the accumulation of military power, in such permanent works, the assent of the State legislature should be required, before they could be erected? This view seems to be neither unreasonable,

(1) 1 Peters 635.

nor overstrained. On the contrary, this inference would be warranted by the supposition that the State authority would view, with natural jealousy, the collection of numerous armed forces, stationed among them in permanent works, established without their consent, and beyond their control; and hence we have seen, that in the cessions made by the States, under this power, there has been a reservation of the right to serve all State process, civil and criminal, upon persons found therein. If, however, the construction contended for, of that part of the Constitution, is not warranted, then, it would seem to follow, that Congress might, and the President too, if it be conceded that he has, without the authority of law, rightfully the power to erect forts, magazines, and arsenals, upon any and all of the public lands within the new States; thus appropriating them to objects never contemplated by the deed of cession, but in positive violation of the trust delegated; and establishing a cordon of military posts within the body of a State, without its consent, and against its inclination. The view we have taken, denying this power, is greatly aided by an act of Congress of the 3d of March, 1819, " *Authorizing the sale of certain Military Sites*," which provides " That the Secretary of War be, and he is hereby authorized, under the direction of the President of the United States, to cause to be sold, such military sites belonging to the United States, as may have been found, or become, useless for military purposes; and the jurisdiction which has been specially ceded for military purposes to the United States, by a State, over such sites, shall hereafter cease."(1) This act, it will be perceived, relates exclusively to such sites as had been found, or had become, at the time of the passage thereof, useless; and it is evident that Congress did not, from the very phraseology of the act itself, contemplate, that any other military sites existed, but such as had been purchased of individuals by the consent of the State legislatures, by the retrocession or cessation of the jurisdiction before ceded by the States. The idea never occurred, that the public lands had been permanently appropriated to such purposes; but that the occupations, in such cases, were merely temporary, and terminated with the cause that produced them. It is not very probable that such a state of things would be likely to occur; yet, if the reasoning in this case, for the defendant, be correct, it would seem inevitably to lead to such conclusions. It cannot be, that reasons and inferences, drawn from the exercise of implied power, can be either sound, or just, which would tend to consequences so dangerous and liable to abuse, if not affording means to him who, should he be so disposed, might overturn, in succession, the sovereignty and independence of all the States. Satisfied, however, that there has been no act of Congress passed,

(1) 3 Story's Laws, 1742.

McConnell *v.* Wilcox.

expressly reserving from sale the particular tract of land on which the stockade called Fort Dearborn is situated, and appropriating it to military purposes; and that the President has not made any order previous to the passage of the pre-emption laws, reserving this tract for such objects; and moreover, considering it as admitted, that the Commissioner of the General Land Office, or any other officer of the government, was not authorized, in any way whatever, to make the reservation contended for; and that there is nothing in the general laws regulating the sale of the public land, and conferring the powers, and prescribing the duties of the public officers of the United States, to sanction, much less authorize, this act of reservation, and that it is not confirmed by the reservation in the pre-emption laws, we must arrive at the conclusion, that the reservation, if there was one, at the time and manner in which it was made, was unauthorized by any law of the United States, or any other legal authority whatever, and that it could not be included in the reservations named in the President's Proclamation. A further and necessary enquiry remains to be made, to ascertain whether the Land Officers had jurisdiction over this particular tract, for the purpose of allowing the pre-emption, and making the sale to Beaubien, supposing it admitted that they could not determine themselves the question of reservation, or no reservation. We have satisfied ourselves that the land was not reserved from sale by an act of Congress, or by order of the President of the United States. Let us now consider whether it has been appropriated for any purpose whatever; or for the use of the United States, or for the use of the State of Illinois. It has been shown, we think, satisfactorily, that no act of Congress exists, making the reservation contended for; and we take it for granted, that there is no such act appropriating the land, in any manner whatever. It seems equally certain, in our judgment, that an appropriation of the public domain can no more be made by the President of the United States, or any subordinate officer acting under him, without the warrant of law, than in the case of a reservation. Indeed, the objection is stronger; because, as we understand the use of the terms, the word "reservation" does not imply an absolute disposition of the lands, in all cases, but a withholding of them from some other disposition, such as sale, or for the use of schools, and other objects. While on the contrary, the term "appropriation," would imply, most clearly, a setting apart, or application to some particular use; when applied in reference to the public revenues, it will be seen, that in the Constitution of the United States, it is used to express the disposition of the public moneys from the Treasury by law. The phrase is, "No money shall be drawn from the Treasury, but in consequence of appropriations made by law." As to the mean-

ing of the term, in the sense in which it is used in the pre-emption law, we suppose we shall best ascertain that sense, by comparing it with the context of the section itself: It will be seen, that it is applied in a general sense; first—the words are, " or which may have been appropriated for any purpose whatever;" secondly—" or for the use of the United States;" thirdly—" or either of the States in which they (the lands) may be situated." Now let us enquire, by what power can the public lands be appropriated to a State in which they may be situated ?   Certainly not by the order of the President of the United States; but most clearly alone by the authority of an act of Congress; nor could the same lands be ,appropriated to the use of the United States, without such authority; because, we have shown, that certainly without the assent of the representatives in Congress of the several States in the Union, the lands could not be appropriated, or in other words, set apart, or applied to, the use of a State in which they are situated; nor to the use of the United States.  In what manner, and by what means, other than the authority of an act of Congress, could they be appropriated, set apart, or applied to any other purpose whatever?   Surely, if it could not be legally and justly done in the one case, it could not, most clearly, in the other.   It is, in our judgment, entirely useless to discuss the precise meaning of the term "appropriated," in its general and extended sense; because its meaning and application, in the manner it has been used in the pre-emption law, cannot, we think, admit of a doubt.   It means nothing more, in the sense in which it is used, than an application of the lands to some specific use or purpose, by virtue of law, and not by any other power. The next, and, in our view, most important feature in this cause, which remains to be considered, is, the 4th section of the act of Congress, creating the Land Office at Chicago, passed on the 29th June, 1834, which contains the following provisions:

" The President shall be authorized, so soon as the survey shall have been completed, to cause to be offered for sale, in the manner prescribed by law, all the lands lying in said land district, at the Land Offices in the respective districts, in which the land so offered is embraced; reserving only section 16 in each township, the tract reserved for the village of Galena, such other tracts as have been granted to individuals, and such reservations as the President may deem necessary to retain for military posts, any law of Congress heretofore existing to the contrary notwithstanding."

The President of the United States, in directing the sale of the public lands, by his Proclamation of the date of the 12th of February, 1835, in this district—and in which it is admitted the land in question is situated—to be holden on the 15th of June, 1835, at Chicago; and among which lands the South West frac-

tional quarter of Section 10, T. 39 N. R. 14 E. was included, made no other exception in his Proclamation of lands excluded from sale, than is contained in these words : ' The lands reserved by law, for the use of schools, and for other purposes, will be excluded from sale.' From the character and tenor of this Proclamation, taken in connection with the 4th section of the act creating the Land Office at Chicago, and the duty devolved on the President, by the provisions of that section, it is impossible to conceive, that in the proper discharge of his duty, specifically enjoined thereby, he had not examined, and ascertained, that the site in question was not necessary to be retained for military purposes. The words of the act, it will be perceived, are, that the President shall cause " to be offered for sale, in the manner prescribed by law, all the lands lying in the land district, in which the lands so offered are embraced ; reserving only section 16 in each township, the tract reserved for the village of Galena, such other tracts as have been granted to individuals, and the State of Illinois ; and such reservations as the President may deem necessary to retain for military posts, any law of Congress heretofore existing to the contrary notwithstanding." Can it be supposed, when the act declared, that notwithstanding any law of Congress heretofore existing to the contrary, all the lands in the district, except those specially enumerated, should be offered for sale, unless the President should determine that some portion thereof was necessary to be retained for military posts, that, under his Proclamation, made in pursuance, and in accordance with that act, any military post had been reserved. Is it not more consonant to reason, and a just interpretation of his acts, in reference to this matter, that as the law had confided to his judgment and discretion, the decision of the question, whether such military posts were necessary to be retained, he had, on full consideration of the subject, determined that the land in question was not necessary to be so retained. The act, by its very terms, contemplates the possible disposition of such reservations ; and that cases might exist, where it might promote the public interest so to dispose of them. The language of the act, unless thus interpreted, would be idle and unmeaning. The legal presumption is, that the President discharged the public duty imposed on him by the terms of the law, and that the land was in market, as proclaimed by himself; and as is further established by the extended plat furnished to the Land Officers ; and on which there was no evidence by coloring, (the process used and adopted in other cases to note reservations,) or other marks, that it was reserved from sale. In a further view to be given to the provisions of this 4th section of the act, establishing the Chicago Land Office, it is most evident, that the law intended to subject all such reservations to sale, as the Pre-

2E

sident might decide not necessary to be retained for a specific and defined object; to wit—military post; so that under this act, it would seem to be a matter of no importance, whether the fraction had been reserved by law or not. It was to be offered for sale, if the judgment of the President determined it not necessary to be retained; such, in our opinion, is the only admissible and just interpretation of that section. The latter words of the proclamation cannot exempt the lands from the general operation of the order to sell, for the exclusion from sale is only of such lands as are reserved by law for the use of schools, and for other purposes; and the 4th section of the act recited, declares that these reservations by law shall be inoperative in certain cases, if the President determines that they are not necessary to be retained. Upon this view of the facts, and the law relating to the case before the Court, it is difficult to conjecture upon what grounds the Land Officers can be supposed to have exceeded their jurisdiction, and that their acts are necessarily void; we confess we are at a loss, in whatever aspect the questions affecting the legal rights of the parties are considered, to see the least excess of jurisdiction; nor can we imagine how the officers can be liable to the charge, or in any way censurable for their acts. There are, however, other additional grounds, which seem to have a direct bearing on the case, and in our judgment, recognise the legal character of the entry and purchase by Beaubien. It will be recollected that the case shows, that the North fractional quarter of this identical fractional section 10, which the Commissioner of the General Land Office directed the whole of to be reserved for military purposes, was, on the 7th day of May, 1831, entered at the Palestine Office, by one Robert A. Kinzie, by virtue of his pre-emption right, purchased and paid for by him, at the minimum price, and has since been patented. Now, how is it, if the reservation contended for, was duly and legally made, and embraced (as it is undoubtly contained) in the description of the supposed reservation made by the Commissioner, that in the one case the reservation is effectual, as is contended, to bar the right of entry and purchase by pre-emption, and not in the other? On the facts of the case, it is wholly irreconcileable with a just interpretation of the rights of these parties; and the recognition by the government, in the case of Kinzie, must be considered as a clear interpretation, by itself, that there was no legal reservation whatever; because, if there was, the entry and purchase of the North fraction of Section 10, by Robert A. Kinzie, being a part of the same fraction, was necessarily as much inhibited by law, as that of Beaubien's could be. By this act, the government has manifestly put its own interpretation on the character of the supposed reservation, and admitted, we think, thereby, that it was alto-

gether nugatory as such. On the 2d of July, 1836, an act of Congress was passed, entitled "*An act to confirm the sales of Public Lands.*" The first section of this act of the 2d of July, provides, "That in all cases where public lands, taken from the bounds of a former land district, and included within the bounds of a new district, have been sold by the Officers of such former district, under the pre-empton laws, or otherwise, at any time prior to the opening of the Land Office in such new district; and in which the Commissioner of the General Land Office shall be satisfied, that the proceedings, in other respects, have been fair and regular, such entries and sales shall be, and they are hereby confirmed; and patents shall be issued thereupon, as in other cases." The second section declares, "That in all cases where an entry has been made under the pre-emption laws, pursuant to instructions sent to the Register and Receiver, from the Treasury Department, and the proceedings have been in all other respects fair and regular, such entries and sales are hereby confirmed, and patents shall be issued thereon, as in other cases." The first section was evidently intended to cure cases of defective jurisdiction, where the officers of the former district had sold lands under the pre-emption laws, or otherwise, lying in the new district, and prior to the opening of the Land Office in the new district. But the second section provides for another class of cases. From the extreme generality of the language used, the section must apply to all cases where the officers allowing the pre-emption, have proceeded agreeably to the instructions sent to them from the Treasury Department; and the proceedings in the words of the act, have been in all other respects fair and regular. It is, however, urged that this section has no application whatever to the case before the Court. Let us enquire whether this affirmation is true? Upon the supposition that there was no reservation nor appropriation of the fraction of land in controversy; and that the President of the United States had determined that the land was not necessary to be retained for a military post, and that, by his Proclamation, it had been offered for sale according to law; we ask whether it would not have been liable to be entered under the pre-emption law of Congress; and whether an entry and purchase so permitted by the officers of the Chicago Land Office, who had entire jurisdiction in the case, would not have been in pursuance of the general instructions (special ones are not and cannot be allowed) sent to the Register and Receiver from the Treasury Department? And moreover, whether it could be denied, upon proof entirely satisfactory to those officers, of the undeniable right of the.applicant to the right of pre-emption, that the proceedings in the present case could possibly be determined to be other than fair and regular in all other respects? We confess that we are at a loss upon any rational principle of

induction to determine otherwise: Consequently, in this act of Congress, we find a full, complete, and entire recognition of the validity of the entry of the tract of land in question by the applicant; and that, as such, he is upon every principle of legal right and moral justice, entitled to the lands agreeably to the laws of the United States, providing for the disposal of the public domain. We have, however, the construction of the constitutional law officer of the government, on the provisions of this act in an opinion, under date of the 10th of August, 1836, addressed to the Secretary of the Treasury, wherein he remarks, " I would observe that as the second section (meaning of the act above quoted) is enacted in connection with a provision curing certain specified irregularities, the irregularities so cured, must be deemed totally excepted from the second section, and that the same principle must be applied to the first section. That is to say, in the case provided for in the first section, the patent should be issued, provided the proceedings have been fair and regular in all particulars, other than that provided for and remedied in the second section; and in the case provided for in the second section, the patent should be issued, provided the proceedings have been fair and regular in all particulars, except that remedied in the first section." Then we understand by this illustration of that act, if under the second section, the lands were within the district of the officers offering them for sale, and the proceedings have been fair and regular, that then there is no doubt that a patent should issue. We may be permitted to ask if this construction be a fair and rational interpretation of the intention of the law maker as evidenced by the second section of the act, whether this section remedied any pre-existing defect in the entries it professes to cure and confirm? It would seem, under such a construction, as we understand it, to have been a nugatory and useless act of legislation; but admitting the construction to be correct, still we conceive that it was a direct confirmation of such pre-emptions as had been regularly obtained, and sanctioned every allowance by the Land Officers of a pre-emption so by them granted. Whether the act was absolutely necessary to secure the right, it is unnecessary now to enquire. The effect alone is to be determined; and it must be considered as a legislative sanction of the right granted to pre-emptors. The terms of the section are general. In all cases where an entry has been made under the pre-emption laws, pursuant to instructions sent to the Register and Receiver from the Treasury Department, such entries and sales are confirmed. This is an universal confirmation of all cases of the regular purchase of land under pre-emptions. The next question to be considered, is, whether there was fraud in obtaining the pre-emption by Beaubien? And here we are first to enquire what is fraud, and in what does it consist?

It is defined by all judges, jurists, and commentators on law, "That to constitute actual fraud between two or more persons, to the prejudice of a third, contrivance and design to injure such third person by depriving him of some right, or otherwise impairing it, must be shown; actual fraud is not to be presumed, but ought to be proved by the party who alleges it; and if the motive and design of an act may be traced to an honest and legitimate source, equally as to a corrupt one, the former ought to be preferred."(1) It may consist in making a false representation with the knowledge at the time that it is false, with a design to deceive and defraud, or in the wilful concealment of the truth for a similar purpose. There is nothing appearing in the case imputing to Beaubien any false or fraudulent representations in regard to his claim, or the facts upon which he founded his right to his pre-emption; nor does it appear that he concealed at any time from the knowledge of the officers with whom he communicated, any fact, whatever, necessary to a fair understanding of his claim, and the supposed right of the government, under the reservation, as made at Washington. Equally free from, and above all suspicion, is the conduct of the officers granting the pre-emption to him. No design or contrivance is imputed to any of the parties in the transaction, and none has been shown; because none has been attempted. The transaction is admitted to have been untainted, and above the breath of suspicion. For aught, then, that we can see, it must follow, upon a consideration of all the facts of the case, and laws applicable to it, that this pre-emption was duly and formally granted, by an authority having exclusive jurisdiction and power over the subject matter upon which it acted at the time; and that it is conclusive and binding on the government. Having thus far, in the investigation of the legal character of the claim advanced by the lessor of the plaintiff, necessarily considered and examined the objections urged in the defence, except the first, third, and fourth, we proceed to the consideration of those, and the arguments advanced by the counsel for the plaintiff's lessors, in support of the legal title, and a right to maintain the present action. The first objection, that no action of ejectment can be sustained against a military officer, in the occupancy of lands, as such, is readily disposed of. In the case of Meigs and others *v.* McClung's Lessee,(2) in an action of eject-ment, brought to recover a tract of land which was claimed under a grant from the State of North Carolina, upon which the defendants resided, as officers, and under the authority of the United States, which had a garrison there, and had erected works, at an expense of thirty thousand dollars, one of the grounds of the defence was, because the land was occupied by the United States' troops and the defendants, as officers of the United States, for the

(1) Conrad *v.* Nicoll, 4 Peters 295.   (2) 9 Cranch 11.

2E*

McConnell v. Wilcox.

benefit of the United States, and by their direction. Chief Justice
Marshall, in delivering the opinion of the Court in that case,
says: "The fact that the agents of the United States took pos-
session of the land lying above the mouth of the Highwassee,
erected expensive buildings thereon, and placed a garrison there,
cannot be admitted to give an explanation to the treaty which
would contradict its plain words and obvious meaning. The
land is certainly the property of the plaintiff below; and the
United States cannot have intended to deprive him of it by vio-
lence, and without compensation." The defence is not tolerated
for a moment; such an act was clearly military usurpation, and
illegal and indefensible in every point of view in which it could
be placed. This objection then, is necessarily altogether unten-
able. We are not yet prepared to admit the maxim, "*Inter
arma leges silent.*" The remaining questions are, we admit, of
much moment, and involve principles of deep interest. These
objections having been sustained in the Circuit Court, for whose
legal learning and accurate judgment, we entertain the highest
respect, has rendered it more important to examine cautiously
the principles upon which this decision is made; and we are
free to confess, that nothing but a firm and settled conviction of
the soundness of their character, and the evident justice in which
they are founded, has led us to adopt them as the basis of our de-
liberate judgment. In examining the question whether the legal
estate is yet in the United States, or has passed by law, and the
acts of the Land Officers, to the pre-emptor, it may be well to
consider the character of the proof offered, as evidence of a legal
title. The first two certificates produced in evidence, bear date
on the day of purchase, and are required by the several acts of
Congress relating to the sale and disposal of the public lands.
The second of these, is in strict conformity with the mode point-
ed out by Congress, for the primary disposal of the public do-
main, and should be considered a regulation provided by them for
securing the title to the *bona fide* purchaser. The third is the
same as the preceding, except that it is not issued at the time of
the purchase; nor is it required to be filed in the General Land
Office, but is made evidence of title, in an action of ejectment,
in this State, by an act of the General Assembly, "declaring what
shall be evidence in certain cases,"(1) and to which we shall have
occasion hereafter to advert; and lastly a deed from the pre-emp-
tor to the lessor of the plaintiff. It is insisted by the defendant,
that as the law of Congress provides that a patent shall issue on
this final certificate, that the United States cannot be concluded
by any other evidence less than a patent. It will be recollected
that neither Congress, nor the legislature of this State, have made
a patent evidence of title. That it is evidence, in courts of law,

(1) R. L. 280; Gale's Stat. 287.

and of a conclusive character, where the power granting had title to the lands granted, and the officers authority to issue it, no one doubts; but it is certainly true, that there may be other evidence of title, equally conclusive. The patent is not understood to be the title itself, but the evidence thereof. From what source does the title to land derived from a government spring? In arbitrary governments, from the supreme head— be he the emperor, king, or potentate; or by whatever name he is known. In a republic, from the law, making, or authorizing to be made, the grant or sale. In the first case, the party looks alone to his letters patent; in the second, to the law, and the evidence of the acts necessary to be done under the law, to a perfection of his grant, donation, or purchase. If a grant should be made by the Executive of the nation, for a tract of land, to an individual, by patent, not warranted by a previous act of Congress, it must be void the moment it is made, because it is not authorized. The law alone must be the fountain from whence the authority is drawn; and there can be no other source. It will be found that numerous cases exist, of legislative grants to States and individuals, by Congress, where patents have not been required to be issued; and in which cases, we learn, the practice, if we are rightly informed, is not to issue them. How is it, with reference to grants of the 16th sections in each township of the public lands, those made to States for internal improvements, for schools and colleges, and of salines and towns, and various other public objects? Will it be contended, that in these cases, the legal title in the lands is not vested according to the terms of the grant, from the moment it becomes a law, in the party to whom the grant is made, but remains in the government until a patent shall be issued? Surely not. We take it for granted, that in cases of legislative grants, the law is not only evidence of title, but the title itself. "A legislative grant vests title which cannot afterwards be divested by legislative action."(1) We esteem it unnecessary to pursue this illustration further; but proceed to consider whether the grants of lands made to pre-emptors, under, and by virtue of the pre-emption laws of the United States, are not estates in the lands intended to be granted, upon conditions, and which become absolute upon the performance of those conditions? Such would seem to be the spirit and intent of those laws, when attentively considered. We are to look at the beneficent character of those acts, and the peculiar objects they were intended to protect and secure. A class of enterprising, hardy, and most meritorious and valuable citizens had become the pioneers in the settlement and improvement of the new and distant lands of the government. Disregarding the privations, toils and sufferings incident to their condition, they

(1) Powlett v. Clark et al. 3 Peters' Cond. R. 408.

had, by their perseverance, not only expelled the savage from their borders, but had carried civilization, with all its attendant lights and blessings, into the wilderness. By their industry and untiring exertions, they improved the lands, subdued the forests, and by the acceleration which they had given to population and agriculture, increased the value of the lands in a tenfold degree. The government, as a reward for these exertions, granted to the individuals thus situated, rights on these lands, to a certain number of acres, upon proof of settlement and cultivation, and the payment of the minimum price of the public lands, within the time specified in the pre-emption laws. It may be worthy of enquiry here, whether, upon a full compliance of a party with the terms and conditions of these laws, that right so given, can be any more divested than an express legislative grant, without any conditions whatever? Certainly not. It is not then, an estate resting on a contingency, which, if it happen, or be consummated, vests the estate in fee?

Congress possesses the power to grant away these lands, absolutely or conditionally, and they have done so in the case of the pre-emptioner, upon conditions specified in the pre-emption laws; but it is said that this is only a previous right of purchase. Concede this, and what does it establish? That there is a right, and that right is, that the party who settled and cultivated the land within a given period of time, on proof thereof to the officers of the government, to their satisfaction, and payment of the money required therefor, shall be the purchaser and hold the estate. Now will it be denied that this is an interest in land—imperfect it may be—but to become perfect and absolute on performance of the conditions prescribed? When those conditions have all been performed, and the certificates of the Land Officers, which evidence those facts, have been executed and delivered, has not the grant, which under the law was provisional, become perfect and absolute; and is not the law the source, and these evidences of the conditions performed, proof of his title, and as much so as in the case of an absolute grant? Congress, in its legislation on the subject of pre-emptions, in various acts, speak of the pre-emptors as persons having rights, and state in certain cases that their rights shall be forfeited.(1) We understand, also, that it has been the practice of the Land Office Department, at Washington, to permit assignments of the certificates, and to issue patents where the assignment is in conformity to the rules prescribed, to the assignee, and that it so appears on the face of the patent. This is stated as some evidence at least of the character of the interests in these certificates, as understood by the government itself. The act of the 18th of May, 1796, however, expressly authorized the patent to issue to the heirs or assignees of the purchaser.

(1) Act of Feb. 7, 1813, §2; Act of March 3, 1803; Act of May 18, 1796.

A case of illustration will now be put. A is appointed to office, by action of a legislative body, in pursuance of powers derived from the constitution of the State: Would the action of this body be the source of his right to the office, or would such source be his commission? Would not his commission be only evidence of his title to the office, and the election by the legislature, the source of his right? Certainly so, because a commission might be issued to a person not so elected, who in such case would be a mere usurper.

We are led to the conclusion that the laws of Congress by every fair interpretation must be considered as saying to every pre-emptor on the public lands, if you show yourself within the provisions of the pre-emption laws, and that you have honestly and truly performed the conditions required of you by law, the interest or estate which has been provisionally given you, shall become absolute. It may be further asked, whether this right, be it an estate in the lands on conditions performed, or a mere right of previous purchase, can, where it clearly exists, be taken away or destroyed, against the will and consent of the party entitled to the pre-emption? Clearly not. The government is committed by its own voluntary acts, and no third party can interfere with, or impair, or destroy it. A case of seeming analogy has been decided in this Court. We refer to the case of Doe on the demise of Moore *v.* Hill *et al.*, decided at the December term, 1829.(1) The lessor of the plaintiff, in that case, claimed title to a tract of land sold by the government of the United States to Hill, who had purchased the same at the public sale, and obtained a patent therefor, by virtue of a confirmation made by the Governor of the Territory North-West of the river Ohio, in pursuance of the acts of Congress of 1788, and the instructions to the Governor of said Territory. In that case the following points were settled: 1st. A confirmation made by the Governor of the North-West Territory, on the 12th of February, 1799, to a person claiming a tract of land in the said Territory, is, under the resolution and instructions of Congress of June and August of 1788, valid, and operates as a release on the part of the United States of all their right. 2d. Under this power to confirm, the Governor was not limited to any definite number of acres, but could confirm to the extent claimed by the settler. 3d. A confirmation so made by the Governor, cannot be nullified by any act of Congress. 4th. In order to show the act of confirmation, it is not necessary that any evidence should be given of their title to the land, because the power of the Governor was plenary, and his decision on the claim presented to him, is binding on the United States. 5th. By the deed of cession of 1784, from Virginia to the United States, Congress was obliged

(1) Breese 236.

McConnell *v.* Wilcox.

to confirm the settlers in their possessions and titles. By an examination of this case, it will be seen that by an act of Congress passed sixteen years after the powers given to the Governor of the North-Western Territory, to confirm the lands referred to in the act creating his duties, a Board of Commissioners was appointed to set at Kaskaskia, to hear proof relative to British and French grants, and report to the Secretary of the Treasury. The Court say, " That this Board virtually superseded the powers of the Governor, but nothing appears from the acts of Congress, in disapprobation of the proceedings of the Governor, until the passage of an act on the 20th of February, 1812, which authorized the Register and Receiver of the Land Office at Kaskaskia, and another person to be appointed by the President of the United States, to examine and enquire into the validity of claims to land in the district of Kaskaskia, which are derived from confirmations made, or pretended to be made, by the Governor of the North-Western and Indiana Territories respectively, and they shall report to the Secretary of the Treasury, to be laid by him before Congress." The Court proceed to say, " That the soundest principles of policy, as well as good faith, require that the Governor's confirmations should be considered, at least, *prima facie*, valid. The report of the Commissioners is next adverted to, and it is further stated, " That the Secretary of the Treasury considered those confirmations void, and directed the sale of the lands; but the Secretary of the Treasury had no power to order the sale of any lands except those belonging to the United States;" and his act in ordering the sale, is treated as a void act; and it is further said, " That the confirmation was a release of the interest of the United States, and the presumption was, that the deed of confirmation was made in a case authorized by the resolutions of June and August, 1788." To our minds, there is, on principle, an analogy in the two cases, so far as the acts and discretionary powers of the agents of the government are to be viewed, and the character in which these acts are to be considered in point of evidence relating to titles to land originally held by the government, or claimed to be so held. In the case referred to, the certificate of confirmation by the Governor, is held to be at least *prima facie* evidence of title to the estate in the lands claimed; and in the present one, it is not perceived why the same rule should not obtain. The patent of the government to a subsequent innocent purchaser, is held invalid; because the government could not grant the same land twice; and because the patent for that reason was void. In the case of the United States *v.* Arredondo,(1) the Supreme Court of the United States held this language. " If it was not a legal presumption, that public and responsible officers claiming and exercising the

(1) 6 Peters 727.

right of disposing of the public domain, did it by the order and consent of the government in whose name the acts were done, the confusion and uncertainty of titles and possessions would be infinite." " The acts of public officers in disposing of public land, by color or claim of public authority, are evidence thereof, until the contrary appears by the showing of those who oppose the title set up under it; and deny the power by which it is professed to be granted. Without the recognition of this principle, there would be no safety in title papers, and no security for the enjoyment of property under them." The law of Congress requiring patents to issue, was passed when the old credit system of disposing of the public lands existed, and that patent was to issue on the certificate of final payment. We think it important that the laws providing for the sales of the public lands, under the old and new system, should be noticed, and the distinction kept in view. Under the old system, the purchase, being on credit for three-fourths of the purchase money, was contingent; but under the present, it is for cash in full, and perfect and absolute. The patent was, however, on the final payment, to be issued to him, or his heirs, or assigns. It may be important, as an early evidence of the intentions and views of Congress on the subject of the sales of the public lands, and to show in what light they considered the sales thereof, to note the act of the 18th of May, 1796. After prescribing the terms on which the land shall be sold, it directs the form of the certificate which shall be given, and requires the land sold to be described—the sum paid on account—the balance remaining due—the time when such balance becomes payable, and that the whole land sold will be forfeited if the said balance is not then paid ; but that if it shall be duly discharged, the purchaser or his assigns, or other legal representative, shall be entitled to a patent. " On payment of the balance, a patent is directed to be issued. It declares, if there should be a failure in any payment, the sale shall be void, all money theretofore paid on account of the purchase, shall be forfeited to the United States; and the land thus sold, shall be again disposed of in the same manner as if a sale had never been made." Here we see that a direct and positive sale is recognised, and the land sold in case of non-payment of any part of the balance, is declared to be forfeited.

It is manifest, from this language, that Congress considered the purchaser as having a legal estate in the lands purchased, of some description, under this certificate; otherwise they would not have declared in what cases the land should be forfeited. Such, however, seems to be the whole course of legislation on the public lands, and in almost every act the right acquired by the purchaser, seems to be viewed as a conditional or absolute estate in the lands; and the invariable practice has been for the

purchaser under all the systems and regulations for the sale of these lands, to enter into possession of them, either before or after the purchase, if he so desired. It would be singular indeed, if the purchasers of the millions of acres of the public domain, which have been recently paid for by them, and for which they have received the evidence thereof, from the public officers of the government, should be told that they had only some inchoate, indefinite, and imperfect and equitable title to the lands thus sold by the government, and that the legal estate was yet in the government; and that as the government could not be coerced by suit to issue a patent, and the public officers might use their discretion to issue or not issue the patent, intruders on the lands could not be removed, and might enjoy unmolested the possession thereof, committing what destruction and injury they pleased, until they could produce a formal patent therefor. The mere statement of such a supposition would have a most startling effect; and those thus situated would indeed gravely ask whether they lived under a government of laws in which justice was equally dispensed, and the rights of all protected alike? To silence forever and put at rest these quaint and refined subtleties, and to protect the purchasers of the public domain within the limits of this State, the General Assembly, with a forecast worthy of all praise, as early as 1823, (and which was incorporated in the revised code of 1827,) passed "*An act declaring what shall be evidence in certain cases.*"(1)  By the fourth section of that act, it is provided "That the official certificate of any Register or Receiver of any Land Office of the United States, to any fact or matter of record in his office, shall be received in evidence in any court in this State; and shall be competent to prove the fact so certified. The certificate of any such Register of the entry or purchase of any tract of land within his district, shall be deemed and taken to be evidence of title in the party who made such entry or purchase, or his heirs or assigns, to recover the possession of the land described in such certificate, in any action of ejectment or forcible entry and detainer, unless a better legal and paramount title be exhibited for the same." To this statute this Court has, in the case of Bruner *v.* Manlove,(2) given an exposition by the unanimous opinion of the Court, which every day's experience shows to be based on the firmest principles of policy and justice. In that case it was said, "That the Register's certificate is raised to as high a point of evidence in this form of action, as a patent possibly could be. Its effect is to be the same, and the rights derived from it, for the purpose of recovering or maintaining possession of lands described in it, are co-extensive with the most formal regularly issued patents. These certificates not only vest the title acquired by purchase from the govern-

(1) R. L. 280; Gale's Stat. 287.        (2) *Ante* 156.

ment, in the purchaser for the purpose named, but make that title transmissible to the heirs or the assignee.   For any purpose then, so far as regards the character of these certificates, as evidence in an action of ejectment, they must be considered of as high a dignity as patents, and partaking of all their legal attributes.   Having settled their character and effect, the rights of the parties under them, must be governed by the same rules of interpretation as in the case of patents.   No reason can exist for an exception."   Whatever doubt may have existed as to the character of the right or interest acquired by the purchaser of land from the government of the United States, and the light in which the certificates of the Land Officers should be considered as evidence in the courts of this State, we apprehend has been for ever put to rest by this necessary and provident law.   We appeal to the unsophisticated and sober judgment of every rational and unbiassed mind, and ask, whether the idea that purchases so held by these evidences of title, which have doubtless passed through various and numerous hands, are to be for a moment thus impaired by the toleration of such arguments against their validity ? It is a matter of universal notoriety, that these are the only evidences of title, in nine cases out of ten, held by the purchasers of the public lands, for some years past; and that it has become, and will remain, impossible, for years to come, under the present force in the General Land Office, to issue patents for millions of acres of land thus purchased.   The necessity of the case, then, most imperiously admonishes us of the profound wisdom and necessity of the act.   It has therefore been considered altogether unnecessary to refer to, and adduce the numerous decisions of the various courts in the United States, departing from the rigid doctrines of the common law as to what should be considered evidence of title in an action of ejectment.   Among which the most prominent is, the case of Sim's Lessee *v.* Irvine, in which it was adjudged that payment of the purchase money to the State, and survey of the land, gave a legal right of entry, and was sufficient evidence in an action of ejectment.   The Supreme Court of the United States, in reviewing this case, say, " This having become in Pennsylvania an established legal right, and having incorporated itself as such with property and tenures, must be regarded by the common law Courts of the United States in Pennsylvania, as a ruling decision."   Numerous other cases might be cited, decided by the Supreme Court of the United States, in which it is held that evidence of title to land, is to be governed by the " *Lex loci rei situæ.*"   That the law of the State where the land lies, is to govern both as to the form of the remedy and the evidence of title seems to be so well settled by a long and uniform course of decisions, that we have supposed it beyond the possibility of doubt.   The Circuit Court have, in our

opinion, fallen into an error on this point, which has, in our judgment, arisen from the light in which it has viewed the pre-emptor's purchase. It seems to have confounded this purchase with the imperfect, uncertain, and anomalous modes heretofore pursued in acquiring lands in the States of North Carolina, Kentucky, and other States of the Union, where those States were the proprietors of the soil; and it has adopted the opinion of the Supreme Court of the United States on those inceptive and inchoate titles, as the rule to be applied in the present case, without regarding the manifest distinction. In these cases, the person entering was to procure a warrant of survey, and pay money at a future day; and from the inception of the title by entry, his right though it might be considered legal, was necessarily inchoate. In the case before us, the purchase and acquisition of the title is an entire act, performed at one and the same time; the certificate, as evidence of that purchase and acquisition, is given on the payment of the consideration money, and the sale being completed, the title passes, and the certificate is evidence thereof, at least *prima facie*, and warrants a right of entry on the land. By the terms of the Ordinance admitting the State of Illinois into the Union, it was among other things stipulated, " That every and each tract of land sold by the United States, from and after the first day of January, 1819, shall remain exempt from any tax laid by order or under the authority of the State, for any purpose whatever, for the term of five years from and after the day of sale.(1) Now at what time would this exemption begin to run? Certainly from the day of sale, and not from the time of issuing the patent. As long as the estate is in the United States, the lands are not taxable; and if the legal estate did not pass at the time of the purchase and sale, the land could not be taxed until the patent issues.—The proposition that the estate remains in the United States, until the patent issues, could never be adopted as a rule from whence to compute the time for such purpose, because of its extreme uncertainty and perpetual variableness. The sale must be considered as severing the particular tract purchased, from the mass of the public lands, " *eo instanti*," as has well been remarked, from which time the five years are to be computed, and a divestiture of the title of the United States ensues, and the purchaser's title necessarily vests thereby. The legislature in the enactment of the law just quoted, must have so considered it, and with the view to remove all doubt, never presumed their constitutional right to pass it, could be questioned. It is, however, said, that while this act is admitted to be just and politic as between individuals, it cannot be applied where the rights of the government are in issue. It is also admitted that the State had the undoubted right to pass the law, and to prescribe

(1) R. L. 51; Gale's Stat. 39.

what should be the rules of evidence in the courts of the State; but that it cannot be obligatory on the United States, because it violates the Ordinance of 1787, being an "interference with the primary disposal of the soil by the United States, and the regulations which Congress has adopted to secure the title to the *bona fide* purchasers." We lay it down as an incontrovertible position, that the character of a general law, and the force, effect, and application thereof, are not to be determined by the character of the parties to the action. It would be strange, indeed, if such a rule could prevail; it must be of universal application, within the State which has adopted it as a rule of action, if it has been constitutionally adopted, and the courts of the States being bound to regard laws so passed, must so consider them. Unless, then, the act is void, for the reason that it conflicts with the Ordinance of 1787, its binding force on all parties in the State courts, is undeniable. Let the alleged conflict of the provisions of this law, with the Ordinance, be now considered; and here we confess we are at a loss to conjecture in what part of the provision of the section of the law, that conflict is to be found. In what manner does it interfere with the primary disposal of the soil? Does it not adopt the mode prescribed by Congress, and declare that this mode shall be evidence of title, until a better one is shown? Has it said the lands shall not be sold? No. Has it attempted to prescribe to the government of the United States in what manner such sales shall be made? No. Has it, by indirect means or oppressive provisions, in any way whatever, embarrassed the sales made or proposed to be made? No. Has it imposed a tax on the lands, or prohibited an entry, or prevented the purchaser from occupying the same? No. In what then does this interference consist? In nothing. On the contrary it has recognised the right of the government to the fullest possible extent, to sell and dispose of those lands; and has not only recognised, to the fullest extent, the rights of the purchaser under such sales, but has provided a means for him to acquire his possession when his right is disputed unjustly; and as a measure of preventive justice, protected him from the acts of the lawless intruder, without leaving him to the tardy and uncertain process of the production of his patent, from the notoriety of the difficulty of obtaining which, he might have to wait in years of expectation, without remedy. But we are told that it "interferes with the regulations adopted to secure the title to the *bona fide* purchasers." With what regulation does it interfere? Does or can it prevent the issue of the certificate or patent? Is it an interference because it is ancillary to the assertion of the rights of which the patent would be evidence, and removes the difficulty under which the party must labor until its obtention,— because it protects the party in his purchase, advances the means

of proof of his legal interest and right of entry on the lands by him honestly and fairly purchased, and dispenses with the law's delays attendant on the production of the patent, and above all adds greatly to the security of the party's rights and possessions? Can it be asserted, with reason, that this beneficial and remedial law, is an interference with the regulations of Congress to secure the title to the purchasers of the public domain? In vain shall language be tortured, to prove satisfactorily such a result. But if it were admitted for the sake of argument, to be so, it is equally so in the case decided between Bruner and Manlove. This Court did not, in that case, so esteem it; nor yet in the case of Doe on the demise of Moore *v*. Hill, in which it adjudged the certificate of Governor St. Clair, more effectual than the patent issued by the President for the same land some years since. The judiciary committee of the United States Senate, in a report by Judge Burnet of Ohio, as chairman thereof, on the class of claims of which this thus decided formed one, expressed opinions in exact coincidence with that decision. The decision of this Court in that case, and the report, were made nearly simultaneously. If the law be an interference in any case, it must be so in all. The conclusion is inevitable. It cannot be valid in one case, and invalid in another precisely similar, though the parties may differ in name and person. The incongruity and unsoundness of the assertion, seems too apparent to require further comment. It is also contended that the better legal and paramount title to the lands in question, is in the government, and that this has been shown. It may be worthy of consideration, to ask, what the framers of this law considered a better legal and paramount title? Is it rational to suppose that they conceived, when they were providing an additional and auxiliary means of proof for the purchaser, of the public domain, and by which he was either to obtain his possessions, having the right in himself, or to protect himself therein, that they contemplated the idea, that although the party had purchased and paid the government for the land, the better legal and paramount title remained in the government; and that against the assertion of such title, he should be protected. It would, in our estimation, be putting an intention into the minds of the legislators of too unjust and ungenerous a suspicion against the government, which, from the uniform character of its acts, and high sense of the principles of universal justice, would have been as derogatory to those entertaining such opinions, as it could not fail to be to those who should act on them. This view could never have entered into their conception. But as the history of the country had shown, and as the case of Doe on the demise of Moore *v*. Hill, before referred to, proves, there were many British and French grants which had been located on the public lands in this State, some of which the government had

recognised, and others having been considered void, the government had sold, and intended to sell the lands thus claimed. The case of Hill shows a case of the kind, and is one of the class of cases intended by the description of a better legal and paramount title; for by the decision of this Court in that case, it overreached the patent of the United States, and was therefore decided to be the better legal and paramount title. This case abundantly illustrates what the legislature of Illinois intended by the better legal and paramount title. This accords with the sense of the terms used, and the intentions of the framers of the act. The words, the context, the subject matter, the effects, and the consequences, and the reason, and the spirit of the law, all establish, to our minds, the interpretation we have put on it; we think it can justly admit of no other. Hence we conclude, that the application of this part of the statute to the case, as showing the title in the government, and adverse to the right of recovery, is by no means warranted. For the reasons given, there can be no paramount title in this case, because the government had parted with all they had, according to the forms of law prescribed for the mode of disposing of the public lands, and are concluded and estopped by the acts of their own officers.—Other examples are not wanting of similar provident and useful legislation of this State, in reference to title to land. By acts in force, July 1st, 1827 and 1829,(1) it is provided that conveyances of lands shall be valid, notwithstanding the grantor is out of possession at the time of the grant, or the lands are held adversely, and that the words "grant, bargain, and sell," shall be held an express covenant to the grantee, his heirs, and assigns, that the grantor was seized of an indefeasible estate in fee simple, freed from incumbrances from the grantor, except rents and services that may be reserved, unless limited by express words contained in such deed. We hold, in regard to municipal rights and obligations, that the government, as a moral being, must be, in contracting, subject, in the absence of a law of Congress in relation thereto, to the laws of the States, and that the same principles and rules of interpretation of contracts and acts growing out of them, as prevail between individuals, must be applicable to it. "Thus, if the United States becomes the holder of a bill of exchange, they are bound to the same diligence, as to giving notice, in order to charge an endorser upon the dishonor of the bill, as a private holder would be."(2) With these views we arrive at the conclusion, that the third ground of objection fails. In connection with this part of the case, an argument has been started by one of the counsel for the lessor of the plaintiff, which if entered into, would embrace a wide field of enquiry, not only interesting for the character of the question it discusses, but certainly involving

(1) R. L. 130, 510; Gale's Stat. 149, 555.　　(2) Story's Const. 408.
2f*

a subject of grave import, affecting the rights of the Western States. The question whether, if at all, or how far, the Western States are bound by the Ordinance of 1787, after they have become sovereign, free, and independent States; and whether the exercise of the powers appertaining to all sovereign States, connected with the principles of eminent and high domain, may not be asserted by the States, are subjects which we hope may, by a just and liberal policy on the part of the general government towards the new States, give repose to the disturbing character which the agitation of this question is calculated to produce. The exercise of powers and jurisdiction by the new States over the public lands within their respective limits, for the purpose of intercommunication between their citizens, by the means of roads, and the political and legal organization of new counties in this State, on and over districts of country not even yet surveyed, has been so long permitted and acquiesced in, as to ripen into an acknowledged right; and we are not aware that for any other object, it would be useful to examine questions which it is sincerely hoped may remain undisturbed.

As to the last and remaining ground assumed in defence, it must be conceded that the United States could not be a defendant in a State court, in any action whatever, such court having no jurisdiction over her; and consent could not give it. And although it is certainly true that the tenant, in all actions of ejectment, may defend himself by showing the title of his landlord, it does not follow that the party who could not be a defendant for want of jurisdiction in the court over him, may defend himself in such case in the name of a person, who, upon no reasonable supposition, could be considered as standing in the nature of a tenant. Can it be that a military officer, charged with the command of troops in the occupation of a garrison, is the tenant of a power, which not only commands his movements at will, but whose physical action, if the term be admissible, is entirely dependent on the direction of his superior, and that the relation of landlord and tenant is created by this military connection? Is not the idea repugnant to all our notions of legal rights, whether drawn from the civil, statute, or common law? And although it has been held that every person may be considered a landlord for the purpose of being admitted to defend an ejectment, whose title is connected to, and consistent with, the possession of the occupier, can it be that the United States could so appear where jurisdiction is not given? If not, how is it that the converse of the rule is applied? and that if the officer cannot defend by showing title in another, that another may defend in the name of him who has neither title nor defence? It is however deemed of little importance to decide this particular question, because all those affecting the real merits of the controversy, and

McConnell *v.* Wilcox.

the rights of the parties, are considered to have been fully and particularly examined and decided. In arriving at a final conclusion in this case, it is but just to remark, that the principles upon which it turns, cannot for a moment be supposed to be in any way affected by the value of the lands in controversy, be it small or great. Satisfied of the legality and justice of the case presented by the lessor of the plaintiff, and that the granting of the pre-emption to Beaubien was a matter of simple right, disconnected with the equity with which his claim would be necessarily connected, marked as it is with the continued and protracted occupation during a period of 19 years—a much greater portion of which the spot so by him occupied was in the midst of a wilderness, exposed to all the dangers and vicissitudes necessarily connected with a location so immediately surrounded by savages, and that this view of the whole case cannot be considered repugnant to the universal principles of justice, and the sense of right entertained by the government itself; it is the opinion of a majority of the Court, that the judgment of the Circuit Court be reversed; and this Court, proceeding to render such judgment as the Circuit Court ought to have rendered, do order and adjudge, that judgment be rendered herein for the lessor of the plaintiff, that he recover his term of years unexpired and yet to come in the premises in the declaration described, with his costs of suit in this Court, and the Court below; and that a writ of possession and execution be awarded for such purpose.

*Judgment reversed.*

*Note.* Since the decision of this case, the following act has become a law :

AN ACT to amend an act, entitled " An act declaring what shall be evidence in certain cases," approved January 10, 1827.

Sec. 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That a patent for land shall be deemed and considered a better legal and paramount title in the patentee, his heirs or assigns, than the official certificate of any register of a land office of the United States, of the entry or purchase of the same land.

Approved, by the Council, February 27, 1839.

Acts of 1838–9, 196.

——

A purchaser of land from the government of the United States or of this State, acquires a right to all the improvements made upon it anterior to his purchase. The act of February 23, 1819, giving the right to remove fences made by mistake upon the land of other persons, applies only to natural persons: it has no relation to a case where a fence is erected by mistake upon the lands of the United States, or of this State. Blair *v.* Worley, *Ante* 178.

It is a principle of the common law, that the government cannot be guilty of laches. It is also well settled, that a State is not barred by a statute of limitations, unless expressly named. Madison county *v.* Bartlett, *Ante* 67; State Bank of Illinois *v.* Brown *et al., Ante* 106. See also, U. S. *v.* Kirkpatrick *et al.,* 9 Wheat. 720; 5 Peters' Cond. R. 733; Dox *et al. v.* The P. M. G., 1 Peters 325.

The certificate of the Register of a Land Office, of the purchase of a portion

McConnell *v.* Wilcox.

of the public lands of the U. S., is, under the statute of this State, of as high a character in point of evidence as a patent, in an action of ejectment; and is to be governed by the same rules of interpretation. The elder certificate is conclusive against a subsequent one. Bruner *v.* Manlove *et al., Ante* 156.

· As to the estate of a pre-emptioner, see Davenport *v.* Farrar, *Ante* 314.

The title to, and disposition of, real property, by deed or will, must be exclusively subject to the laws of the country where it is situated. Kerr *v.* Devisees of Moon, 9 Wheat. 565; 5 Peters' Cond. 682.

It is an acknowledged principle of law, that the title and disposition of real property is exclusively subject to the laws of the country where it is situated, which can alone prescribe the mode by which a title to it can pass from one person to another. McCormick *et al. v.* Sullivan *et al.*, 10 Wheat. 192; 6 Peters' Cond. R. 71.

The foregoing case of McConnell *v.* Wilcox, was appealed to the Supreme Court of the U. S., where the following points were decided.

Ejectment for a tract of land in Cook county, Illinois, being a fractional section, embracing the military post called Fort Dearborn, at the time of the institution of the suit, in the possession of the defendant as the commanding officer of the United States. The Post was established in 1804, and was occupied by the troops of the United States until August 16th, 1812, when the troops were massacred, and the fort taken by the enemy. It was reoccupied by the United States in 1816, and continued to be so held until May, 1823, during which time some factory houses, for the use of the Indian Department, were erected on it. It was evacuated by order of the War Department in 1823, and was, by order of the Department, again occupied by troops in 1828, as one of the military posts of the United States; was again evacuated in 1831, the government having authorized a person to take and keep possession of it. It was again occupied by troops of the United States in 1832, and continued so to be at the commencement of this suit, being generally known at Chicago, to be occupied as a military post of the United States. The buildings about the garrison were not sold in 1831, when it was evacuated; although a great part of the moveable property in and about it was sold. In 1817, Beaubien bought of an army contractor, for one thousand dollars, a house built on the land. There was attached to the house, an enclosure occupied as a garden or field, of which Beaubien continued in possession until 1836. In 1823, the factory houses on the land were sold by order of the Secretary of War, and were bought by Beaubien, for five hundred dollars. Of these he took possession, and continued to occupy them, and to cultivate the land, without interruption by the United States, until the commencement of this suit. The United States in May, 1834, built a lighthouse on the land, and have kept twenty acres enclosed and cultivated. The land was surveyed by the government of the United States in 1821; and in 1824, at the instance of the Indian Agent at Chicago, the Secretary of War requested the Commissioner of the General Land Office to reserve this land for the accommodation and protection of the property of the Indian Agency; who, in 1821, informed the Secretary of War that he had directed this section of land to be reserved from sale for military purposes. In May, 1831, Beaubien claimed this land, at the Land Office in Palestine, for pre-emption. This claim was rejected, and, by the Commissioner of the Land Office, he was, in February, 1832, informed that the land was reserved for military purposes. This information was also given to others who applied on his behalf. In 1834, he applied for this land to the Office in Danville, and his application was rejected. In 1835, Beaubien applied for the land to the Land Office at Chicago; when his claim to pre-emption was allowed; and he paid the purchase money, and procured the Register's certificate. Beaubien sold and conveyed his interest to the plaintiff in the ejectment. *Held* that Beaubien acquired no title to the land by his entry; and that the right of the United States to the land was not divested or affected by the entry at the Land Office at Chicago; or by any of the previous acts of Beaubien.

The decision of the Register and Receiver of a Land Office, in the absence of fraud, would be conclusive as to the facts that the applicant for the land was then in possession, and of his cultivating the land during the preceding year; because these questions are directly submitted to those officers. Yet, if they undertake to grant pre-emptions to land, on which the law declares they shall not be granted, then they are acting upon a subject matter clearly not within their jurisdiction;

McConnell *v.* Wilcox.

as much so as if a Court, whose jurisdiction was declared not to extend beyond a given sum, should attempt cognizance of a case beyond that sum.

Appropriation of land by the government is nothing more nor less than setting it apart for some particular use. In the case before the Court, there has been an appropriation of the land, not only in fact, but in law, for a military post; for an Indian Agency; and for the erection of a lighthouse.

By the act of Congress of 1830, all lands are exempted from pre-emption which are reserved from sale by order of the President of the United States. The President speaks and acts through the heads of the several departments, in relation to subjects which appertain to their respective duties. Both military posts, and Indian affairs, including agencies, belonging to the War Department. A reservation of lands, made at the request of the Secretary of War, for purposes in his department, must be considered as made by the President of the United States within the terms of the act of Congress.

Whensoever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated, becomes severed from the mass of public lands; and no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it; although no other reservation were made of it.

The right of pre-emption was a bounty extended to settlers and occupants of the public domain. This bounty, it cannot be supposed was designed to be extended to the sacrifice of public establishments, or of great public interests.

Nothing passes a perfect title to public lands, with the exception of a few cases, but a patent. The exceptions are, where Congress grants lands, in words of present grant. The general rule applies as well to pre-emptions as to other purchases of public lands.

The act of the legislature of Illinois, giving a right to the holder of a Register's certificate of the entry of public lands, to recover possession of such lands in an action of ejectment, does not apply to cases where a paramount title to the lands is in the hands of the defendant, or of those he represents. The exception in the law of Illinois, applies to cases in which the United States have not parted with the title to the land, by granting a patent for it.

A state has a perfect right to legislate as she may please in regard to the remedies to be prosecuted in her courts; and to regulate the disposition of the property of her citizens, by descent, devise, or alienation. But Congress are invested, by the Constitution, with the power of disposing of the public land, and making needful rules and regulations respecting it.

Where a patent has not been issued for a part of the public lands, a State has no power to declare any title, less than a patent, valid against a claim of the United States to the land; or against a title held under a patent granted by the United States.

Whenever the question in any Court, State or Federal, is, whether the title to property which had belonged to the United States, has passed, that question must be resolved by the laws of the United States. But whenever the property has passed, according to those laws, then the property, like all other in the State, is subject to State legislation; so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States.

Every tribunal acting judicially, whilst acting within the sphere of its jurisdiction, where no appellate tribunal is created, its judgment is final: and even where there is such an appellate power, the judgment is conclusive where it only comes collaterally in question; so long as it is unreversed. But directly the reverse is true, in relation to the judgment of any court, acting beyond the pale of its authority. This principle is concisely and accurately stated by this Court in the case of Elliott and others *v.* Peirsol and others, reported in 1 Peters 349. 13 Peters 498-9.

Congress have the sole power to declare the dignity and effect of titles emanating from the United States; and the whole legislation of the government in reference to the public lands, declares the patent to be the superior and conclusive evidence of legal title. Until it issues the fee is in the government; which by the patent passes to the grantee, and he is entitled to recover the possession in ejectment. Bagnell *et al. v.* Broderick, 13 Peters 439.

When the title to the public land has passed out of the United States by con-

McConnell *v.* Wilcox.

flicting patents, there can be no objection to the practice adopted by the courts of a State to give effect to the better right, in any form of remedy the legislature or courts of the State may prescribe. *Ibid.*

No doubt is entertained of the power of the States to pass laws authorizing purchasers of lands from the United States, to prosecute actions of ejectment upon certificates of purchase, against trespassers on the lands purchased; but it is denied that the States have any power to declare certificates of purchase of equal dignity with a patent. Congress alone can give them such effect. *Ibid.*